**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES CHERREY, <br><br>          Plaintiff, <br><br>     v. <br><br> JA SOLAR HOLDINGS CO. LTD., BINGYAN REN, ERYING JIA, BAOFANG JIN, JIQING HUANG, SHAOHUA JIA, HOPE NI, YUWEN ZHAO, YUHONG FAN, and JIAN XIE, <br><br>          Defendants. | CASE NO.: 1:17-cv-9912 <br><br> COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS |

Plaintiff James Cherrey ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

**NATURE AND SUMMARY OF THE ACTION**

1.       Plaintiff, a stockholder of JA Solar Holdings Co. Ltd. ("JASO" or the "Company") brings this action against the members of JASO's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) & 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. §§ 240.14a-9, 244.100, & 229.1015(b)(4), arising out of their attempt to sell the Company to Baofang Jin ("Jin") through his wholly-owned companies, JASO Top Holdings Limited ("Topco"), JASO Holdings Limited ("Holdco"), JASO Parent Limited ("Parent"), and JASO Acquisition Limited ("Merger Sub," and collectively with Jin, Topco, Holdco, and Parent, the "Buyer Parties") in a go-private transaction.

2.       On November 17, 2017, the Buyer Parties and the Company announced they had entered into a definitive agreement and plan of merger dated November 17, 2017 ("Merger Agreement"), by which the Company's Chief Executive Officer ("CEO") and Chairman Baofang

Jin, through his wholly-owned affiliates the other Buyer Parties, will acquire all of the outstanding remaining shares and American Depository Shares ("ADS") of the Company in an all-cash transaction valued at $1.51 per share and $7.55 per ADS[1] (the "Proposed Transaction").

3.  The Proposed Transaction implies a total equity value for the Company of $362.1 million.

4.  On December 11, 2017, the Buyer Parties filed a Schedule 13E-3 containing a preliminary proxy statement (the "Proxy") with the SEC. The Proxy is materially deficient and misleading because, *inter alia*, it fails to disclose material information regarding the background of the process leading up to the Proposed Transaction, the financial projections for the Company provided to the Special Committee and its financial advisor, Houlihan Lokey (China) Limited ("Houlihan Lokey"), a GAAP reconciliation of the non-GAAP financial measures contained in the Company's projections, and the financial analysis performed by Houlihan Lokey.

5.  Without additional information the Proxy is materially misleading in violation of federal securities laws.

6.  By unanimously approving the Proposed Transaction and authorizing the issuance of the Proxy, the Individual Defendants participated in the solicitation even though they knew, or should have known, that the Proxy was materially false and/or misleading. The Proxy is an essential link in accomplishing, and receiving stockholder approval for, the Proposed Transaction.

7.  For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants (collectively identified below) from conducting the stockholder vote on the Proposed Transaction unless and until the material information discussed below is disclosed to the holders

---

[1] Each ADS represents five shares of JASO common stock.

of JASO common stock and ADSs or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District, as the Company's ADSs are listed and traded on the NASDAQ within this District; and (ii) Defendants have received substantial compensation in this District by accessing the capital markets active in this District.

## PARTIES AND RELEVANT NON-PARTIES

11. Plaintiff is, and has been at all relevant times, the owner of JASO ADSs.

12. Defendant JASO is a limited liability company organized and existing under the laws of the Cayman Islands. It maintains principal executive offices at Building No. 8, Noble Center, Automobile Museum, East Road, Fengtai, Beijing 100070, People's Republic of China.

13. Defendant Bingyan Ren ("Ren") has served as a director of the Company since May 2005.

14. Defendant Erying Jia ("Erying Jia") has served as a director of the Company since September 2007.

15. Defendant Jin has served as Chairman of the Company since May 2005, Executive Chairman since September 2009, and CEO since January 2013.

16. Defendant Jiqing Huang ("Huang") has served as a director of the Company since August 2009.

17. Defendant Shaohua Jia ("Shaohua Jia") has served as a director of the Company since October 2012.

18. Defendant Hope Ni ("Ni") has served as a director of the Company since August 2009.

19. Defendant Yuwen Zhao ("Zhao") has served as a director of the Company since October 2009.

20. Defendant Yuhong Fan ("Fan") has served as a director of the Company since March 2015. Fan has also served as a vice president since July 2011.

21. Defendant Jian Xie ("Xie") has served as president of the Company since December 2013 and a director since August 2009.

22. Defendants referenced in ¶¶ 13 through 21 are collectively referred to as Individual Defendants and/or the Board.

23. Relevant non-party Topco is an exempted limited liability company under the laws of the Cayman Islands. Topco is wholly-owned by Defendant Jin.

24. Relevant non-party Holdco is an exempted limited liability company incorporated under the laws of the Cayman Islands. Holdco is a wholly-owned subsidiary of Topco.

25. Relevant non-party Parent is an exempted limited liability company incorporated under the laws of the Cayman Islands. Parent is a wholly-owned subsidiary of Holdco.

26. Relevant non-party Merger Sub is an exempted limited liability company incorporated under the laws of the Cayman Islands. Merger Sub is a wholly-owned subsidiary of Parent.

**FURTHER SUBSTANTIVE ALLEGATIONS**

27. On November 17, 2017, the Company issued a joint press release announcing the Proposed Transaction. The Press Release read in relevant part:

> BEIJING, Nov. 17, 2017 (GLOBE NEWSWIRE) -- JA Solar Holdings Co., Ltd. (Nasdaq:JASO) ("JA Solar" or the "Company"), one of the world's largest manufacturers of high-performance solar power products, today announced that it has entered into a definitive agreement and plan of merger (the "Merger Agreement") with JASO Holdings Limited ("Holdco"), JASO Parent Limited ("Parent"), a wholly owned subsidiary of Holdco, and JASO Acquisition Limited ("Merger Sub"), a wholly owned subsidiary of Parent, pursuant to which the Company will be acquired by an investor consortium in an all-cash transaction implying an equity value of the Company of approximately $362.1 million.
>
> Pursuant to the terms of the Merger Agreement, at the effective time of the merger (the "Effective Time), each ordinary share of the Company issued and outstanding immediately prior to the Effective Time (each a "Share") will be cancelled and cease to exist in exchange for the right to receive $1.51 in cash without interest, and each American depositary share (each an "ADS") of the Company, representing 5 Shares, will be cancelled in exchange for the right to receive $7.55 in cash without interest, except for (a) Shares (including Shares represented by ADSs) owned by Jinglong Group Co., Ltd. ("Jinglong"), Chin Tien HUANG, Chi Fung WONG and Pak Wai WONG (together with Jinglong, the "Rollover Shareholders"), which will be rolled over in the transaction, cancelled and cease to exist without any conversion thereof or consideration paid therefor, and (b) Shares held by shareholders who have validly exercised and not effectively withdrawn or lost their rights to dissent from the merger pursuant to Section 238 of the Companies Law of the Cayman Islands (the "Dissenting Shares"), which will be cancelled and cease to exist in exchange for the right to receive the payment of fair value of the Dissenting Shares in accordance with Section 238 of the Companies Law of the Cayman Islands.

At the Effective Time, each (1) outstanding and unexercised option (each a "Company Option") to purchase Shares under the Company's share incentive plans will be cancelled, and each holder of a Company Option (other than the Rollover Shareholders) will have the right to receive an amount in cash determined by multiplying (x) the excess, if any, of $1.51 over the applicable exercise price of such Company Option by (y) the number of Shares such holder could have purchased (assuming full vesting of all options) had such holder exercised such Company Option in full immediately prior to the Effective Time, net of any applicable withholding taxes, and (2) each restricted share and each restricted share unit granted under the Company's share incentive plans shall be cancelled, and each holder thereof will have right to receive a cash amount equal to $1.51, net of any applicable withholding taxes.

The merger consideration represents a premium of 18.2% to the closing price of the Company's ADSs on June 5, 2017, the last trading day prior to the Company's announcement of its receipt of a revised "going-private" proposal, and a premium of 17.2% to the average closing price of the Company's ADSs during the 3-month period prior to its receipt of a revised "going-private" proposal.

The Buyer Group comprises Mr. Baofang Jin, chairman and chief executive officer of the Company, Jinglong, a British Virgin Islands company of which Mr. Baofang Jin is the sole director, and/or its affiliates, and the other Rollover Shareholders.

The Buyer Group intends to fund the merger with a combination of debt and equity. The Buyer Group has delivered an executed debt commitment letter to the Company pursuant to which CSI Finance Limited, Credit Suisse AG, Singapore Branch and certain other parties will provide, subject to the terms and conditions set forth therein, a loan facility to fund the merger in the amount of US$160 million.

The Company's board of directors (the "Board"), acting upon the unanimous recommendation of a committee of independent and disinterested directors established by the Board (the "Special Committee"), approved the Merger Agreement and the merger and resolved to recommend that the Company's shareholders vote to authorize and approve the Merger Agreement and the merger. The Special Committee negotiated the terms of the Merger Agreement with the assistance of its financial and legal advisors.

The merger, which is currently expected to close during the first quarter of 2018, is subject to customary closing conditions including the approval of the Merger Agreement by the affirmative vote of holders of Shares representing at least two-thirds of the voting power of the Shares present and voting in person or by proxy at a meeting of the Company's shareholders convened to consider the approval of the Merger Agreement and the merger. The Buyer Group and

the Rollover Shareholders have agreed to vote all of the Shares and ADSs they beneficially own, which represent approximately 25.7% of the voting rights attached to the outstanding Shares as of the date of the Merger Agreement, in favor of the authorization and approval of the Merger Agreement and the merger. If completed, the merger will result in the Company becoming a privately-owned company and its ADSs will no longer be listed on the Nasdaq Global Select Market.

**The Proxy Misleads JASO Stockholders and ADS Holders by Omitting Material Information**

28. On December 11, 2017, the Buyer Parties and JASO filed the materially misleading and incomplete Proxy with the SEC as an exhibit to the Buyer Parties' Schedule 13E-3. Designed to convince stockholders and ADS holders to vote in favor of the Proposed Transaction, the Proxy is rendered misleading by the omission of critical information concerning the Company's expected future value as a public entity as evidenced by the Company's financial projections, the financial analysis underlying the fairness opinion provided by Houlihan Lokey, and the process ultimately leading to the Merger Agreement.

*Material Omissions Concerning the Company's Financial Projections*

29. First, the Proxy discloses non-GAAP accounting metrics for projected financial information over the years 2017-2021 for EBIT and EBITDA. However, providing these non-GAAP metrics without disclosing the line item metrics used to calculate them, or otherwise reconciling the non-GAAP projections to GAAP measures, makes the provided disclosures materially incomplete and misleading.

30. The Proxy fails to disclose the line items underlying EBITDA necessary to reconcile EBITDA to GAAP measures, including (i) operating earnings; and (ii) stock-based compensation expense.

31. The Proxy fails to disclose the line items underlying unlevered free cash flow necessary to reconcile free cash flow to EBITDA, including capital expenditures.

32. The Proxy must disclose the necessary line items to reconcile these non-GAAP measures to well-understood GAAP financial metrics. Non-GAAP measures have no universally understood definition and vary widely between companies depending on the needs of management in promoting their own effect on Company performance.

33. Because of the non-standardized and potentially manipulative nature of non-GAAP measures, when a company discloses information in a Proxy that includes non-GAAP financial measures, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information. 17 C.F.R. § 244.100. The Proxy makes no effort to account for the failure to reconcile these non-GAAP measures to GAAP metrics.

34. Without disclosure of these reconciling metrics, the Proxy violates SEC regulations and materially misleads JASO stockholders.

35. Furthermore, the Proxy omits management's projections of unlevered, after-tax free cash flows, as used by Houlihan Lokey in performing a *Discounted Cash Flow Analysis*, as well as the definition of unlevered, after-tax free cash flows.

36. These projections were provided to Houlihan Lokey, and used by Houlihan Lokey, for the purpose of creating a fairness opinion that could then be used in soliciting stockholder approval of the Proposed Transaction. Because these analyses were presented to the JASO stockholders and ADS holders as evidence of the fairness of the Proposed Transaction, the omission of the financial projections materially misleads those same stockholders as to the accuracy and value of the analyses.

*Material Omissions Concerning Houlihan Lokey's Financial Analyses*

37. The Proxy describes Houlihan Lokey's fairness opinion and the various valuation analyses it performed in support of its opinion. However, the description of Houlihan Lokey's

fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, JASO's stockholders and ADS holders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Houlihan Lokey's fairness opinion in determining how to cast their vote on the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to JASO's stockholders and ADS holders.

38. With respect to Houlihan Lokey's *Discounted Cash Flow Analysis*, the Proxy fails to disclose the estimated range of terminal values of JASO, the range of perpetuity growth rates of 2.5% to 3.0%, and the inputs and assumptions underlying the discount rates ranging from 10.0% to 11.0%.

39. With respect to Houlihan Lokey's *Selected Transactions Analysis*, the Proxy fails to disclose the individual multiples for each of the selected transactions analyzed by Houlihan Lokey, as well as any benchmarking analyses Houlihan Lokey performed for Orbital in relation to the target companies. Without such information, JASO's stockholders are unable to determine how the multiples used in determining JASO's value compare to the other companies. As a result, stockholders are unable to assess whether JASO utilized unreasonably low multiples, thereby rendering Houlihan Lokey's conclusion regarding the usefulness of such multiples meaningless.

40. With respect to Houlihan Lokey's *Selected Companies Analysis*, the Proxy fails to disclose the individual multiples for each of the selected companies analyzed by Houlihan Lokey, as well as any benchmarking analyses Houlihan Lokey performed for JASO in relation to the target companies. Without such information, JASO's stockholders are unable to determine how the multiples used in determining JASO's value compare to the other companies. As a result, stockholders are unable to assess whether JASO utilized unreasonably low multiples, thereby

rendering Houlihan Lokey's conclusion regarding the usefulness of such multiples meaningless the implied share price ranges set forth in the analyses misleading.

### *Material Omissions Concerning the Background of the Transaction*

41. First, the Proxy suffers materially from sections of missing time and missing prepositions.

42. The Proxy begins its recitation of the background of the Proposed Transaction on June 5, 2015 when the Buyer Parties first proposed a go-private transaction. After describing several meetings and negotiations over the next four months, the Proxy presents a year-and-a-half gap in merger discussions.

43. For the period from October 27, 2015, when the Special Committee met with its advisors regarding a preliminary valuation of the Company, until June 6, 2017, when the Buyer Parties submitted a revised proposal letter, the Proxy provides no information.

44. The Proxy omits any reason for discussions to have faltered in 2015, or any discussions between the Buyer Parties and the Special Committee during this "lost time."

45. The Proxy also omits a substantial portion of a paragraph regarding a meeting of the Special Committee. The entirety of a paragraph found on page 33 is accurately reproduced below:

> which Houlihan Lokey updated the Special Committee of its discussion with the Buyer Group regarding the Buyer The Proposed Transaction was put on hold until the Buyer Group Submitted the Revised Proposal. On June 16, 2017, the Special Committee held a telephonic meeting with Gibson Dunn and Houlihan Lokey at Group's financing plan. Houlihan Lokey and Gibson Dunn then answered questions raised by the Special Committee with respect to the process and timetable of the Revised Proposed Transaction.

46. The Proxy omits the first portion of this paragraph, while the rest of the paragraph is replete with scrivener errors, rendering the entire paragraph meaningless. Within the Proxy, this paragraph serves to summarize the first meeting of the Special Committee following the Buyer

Parties' revised proposal in May 2017. A complete and accurate recitation of these facts must be disclosed in order to cure the material omissions of the Special Committee's actions during this meeting. The sloppiness of this paragraph also brings into question the accuracy and completeness of the remaining summaries provided by the Proxy.

47. Furthermore, the Proxy fails to disclose the conflicts of interest facing Company management throughout the process.

48. Specifically, the Proxy Statement fails to disclose the timing and nature of all communications regarding future employment Company management, including who participated in all such communications.

49. Given the two-year period in which Company employees knew that the Buyer Parties desired to take the Company private, the timing and content of such communications is material as these employees had the ability to shape the Company's financial performance and projections before the renewed go-private discussions beginning in 2017.

50. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

51. Finally, the Proxy omits facts regarding the potential conflicts of interest facing Houlihan Lokey.

52. The Proxy discloses the fee payable to Houlihan Lokey by the Company as a result of the Proposed Transaction.

53. However, the Proxy omits any information on the Company's retention of Houlihan Lokey over the past two years, or any separate engagement of Houlihan Lokey by the Buyer Parties.

54. These omissions directly impugn the independence of Houlihan Lokey and materially mislead JASO's stockholders as to the ability of Houlihan Lokey to act in the best interest of JASO and its stockholders when providing financial advice leading up to the Proposed Transaction. By omitting this information, the Proxy permits the inference that Houlihan Lokey has not performed any services for the Buyer Parties or JASO without any affirmative statement regarding potential services. If Houlihan Lokey has not been engaged or compensated by the Buyer Parties or JASO, the Proxy must affirmatively reflect those facts and disclose facts regarding all conflicts of interest faced by Houlihan Lokey.

55. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**Claim for Violation of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and JASO**

63. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

64. The Individual Defendants disseminated the false and misleading Proxy, which contained statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. JASO is liable as the issuer of these statements.

65. The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy.

66. The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

67. The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

68. The Proxy is an essential link in causing Plaintiff and the Company's stockholders to approve the Proposed Transaction.

69. By reason of the foregoing, defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

70. Because of the false and misleading statements in the Proxy, Plaintiff is threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

71. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

72. The Individual Defendants acted as controlling persons of JASO within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of JASO and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy, they had the

power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

73. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

74. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Proxy.

75. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

76. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, Plaintiff is threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.  Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.  In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.  Directing the Individual Defendants to disseminate a Proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.  Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

E.  Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.  Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated:  December 19, 2017

Respectfully submitted,

By:  /s/ *Christopher J. Kupka*
Christopher J. Kupka
**LEVI & KORSINSKY, LLP**
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: ckupka@zlk.com

Donald J. Enright (to be admitted *pro hac vice*)
Elizabeth K. Tripodi (to be admitted *pro hac vice*)
1101 30th Street, N.W., Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567
Email: denright@zlk.com
etripodi@zlk.com

*Attorneys for Plaintiff*